[No. 31149. Department One. June 20, 1950.]

COLUMBIA CONCRETE PIPE COMPANY, *Respondent*, v. CLAYTON C. KNOWLES *et al., Appellants.*[1]

*Bernice Bacharach,* for appellants.

*Mansfield & Watson,* for respondent.

BEALS, J.—The plaintiff in this action, Columbia Concrete Pipe Company, a corporation, filed its complaint October 2, 1947, alleging its corporate existence; that, during the month of August, 1945, the defendants, Clayton C. and Jane Doe

[1]Reported in 219 P. (2d) 557.

Knowles, husband and wife, became indebted to plaintiff in the sum of $1,414.87 for goods delivered to them by plaintiff, and that no payment had been made upon the account, plaintiff praying for judgment against defendants for the amount above stated, with interest and costs.

The defendants answered the complaint, denying plaintiff's corporate existence, admitting that merchandise was delivered to them by plaintiff, but denying all indebtedness to the plaintiff.

By way of an affirmative defense and counterclaim (also referred to in the answer as a cross-complaint), the defendants alleged that, during the summer of 1945, plaintiff delivered merchandise, consisting principally of concrete pipe, and installed the same on defendants' land to convey pumped water for irrigation purposes; that plaintiff had guaranteed the pipe to be fit for the use above referred to and for which plaintiff installed the pipe; that the pipe was improperly installed; that it was not usable for carrying pumped water for irrigation, and that, by reason of defects in the pipe line and the negligent installation thereof, as pleaded in their answer, defendants had suffered and were continuing to suffer damage to the land and crops thereon, their damages amounting to ten thousand dollars (which amount was, apparently, later raised to the sum of $14,630). Defendants prayed that plaintiff's action be dismissed, and that they be awarded judgment for the damages demanded.

Plaintiff replied, denying the allegations of the affirmative defense set forth in the answer.

The action was tried to the court and resulted in the entry of findings of fact and conclusions of law in plaintiff's favor, followed by a judgment in favor of plaintiff for the sum demanded in its complaint.

From the judgment rendered against them, the defendants have appealed. They have also appealed from the court's refusal to award defendants judgment against the plaintiff, as demanded in their "counterclaim and cross-complaint." In their brief, appellants make the following assignment of errors:

"(1) The trial court erred in making Finding of Fact No. 4 in finding that during the year 1945 there were only 'minor leaks' occurring in said pipe line, and in finding that said leaks were repaired 'pursuant to the agreement between the parties hereto.'

"(2) The court erred in Finding of Fact No. 5 that the reasonable and agreed price for said labor and materials was the sum of $1,414.87.

"(3) The court erred in its Finding of Fact No. 6 that Respondent has not breached any warranty as to fitness of use and purpose for which the pipe line was intended and that Appellants have failed in proof of damage resulting therefrom.

"(4) The trial court erred in granting judgment against the Appellants in any sum whatsoever and in failing to grant a judgment in favor of the Appellants and against Respondent for the sum of $14,630.00, which represents damages sustained by Appellants as a direct and natural result of Respondent's breach of an express and implied warranty and gross negligence.

"(5) The court erred in finding that Respondent Company was a corporation at the commencement of this action, and entitled to maintain suit."

We shall refer to Clayton C. Knowles as though he were the sole appellant.

From the evidence, it appears that, during the year 1944, appellant purchased sixty-three acres of farm land located in the Methow valley in Okanogan county, the land being then irrigated by water taken from a canal on the west side of the property and carried, by gravity flow, through galvanized pipe. Appellant's father, Charles Knowles, moved to the farm in the spring of 1944 and was in charge of the farming operations thereafter. Appellant resided on the farm from about June 1, 1945, until the middle of August following, when he moved to Morton, Washington, where he lived until January, 1947, at which time he removed to California.

While appellant was on the farm in 1945, the season being extremely dry, he decided to procure additional water for irrigation purposes by pumping from the Methow river on the east side of the property, and consulted George Wagenman, who then represented respondent as its "field man."

Appellant stated that he wanted a pipe line that would carry fifteen hundred gallons of water per minute, under pressure, from the river to the edge of that portion of the farm growing alfalfa, and, from that point, one thousand gallons per minute to the end of the line, to be there turned into an open ditch for irrigating another portion of the farm. The proposed pipe line was to run across appellant's property from east to west, and to be so installed that water (when available) could also be taken by gravity flow from the canal on the west side of the farm, replacing the existing irrigation system.

Wagenman examined the land, and recommended the use of ten-inch concrete pipe, informing appellant that respondent would not guarantee the pipe line unless it installed the same. Appellant agreed, and ordered the pipe installed, stressing the need for haste as the crops required water. After further discussion, it was agreed that appellant would dig the ditch for the installation of the pipe and accomplish the backfilling after the pipe had been laid. This portion of the agreement was later modified, and respondent accomplished the backfilling after laying the pipe.

Appellant procured a machine referred to as a "road patrol" and used it in digging the ditch. Appellant and his father both testified that Wagenman did not tell them how deep the trench should be dug, and that he did not inspect it after it was prepared. It appears that respondent's foreman, who was in charge of the installation of the pipe line, told Wagenman that the ditch was not deep enough for proper installation, but it does not appear that this criticism was mentioned either to appellant or to his father. Concerning this matter, Wagenman testified, on direct examination, as follows:

"Q. Did you ever give Mr. Knowles instructions as to the way it should be dug? A. I told him that we would like fifteen inches of cover over the pipe when a job is complete. Q. Was it necessary for you to do any work in connection with the digging of the ditch? A. Well, this road patrol leaves a V-shaped ditch in the bottom and we went along and squared that up. . . . Q. Going back to the ditch that was dug by Mr. Knowles. What was the depth of the

ditch dug by him? A. Oh, I imagine in certain places, only twelve inches deep. Q. What is ordinarily required for depth in laying a ten-inch pipe? A. Oh, twenty-seven to thirty inches. Q. And did Mr. Knowles do the backfill of the pipe? A. No. Q. Mr. Wagenman, did you call Mr. Knowles' attention to the depth of the ditch at the time that it was dug? A. Well, I don't remember but we usually do in cases like that. It is the practice. Q. Was the ditch satisfactory in depth as far as you were concerned? A. Well, we don't like to lay in shallow ditches but he was in a hurry to get it in so we let it go. Q. He was satisfied with the ditch as it was dug? A. Yes."

On cross-examination, the witness testified as follows:

"Q. Did you inspect this ditch before you put any pipe in there? A. No, I don't believe I did. Q. Were you there when the first length of pipe was put in? A. No. Q. Who was there? A. Our laying crew. Q. From the time the defendant started to dig this ditch until the pipe was laid did you ever see the ditch? A. I just don't remember."

Meanwhile, the pump to take water from the river had been installed and, from tests made by pumping water into a flume, appeared to operate satisfactorily. Thirty feet of galvanized pipe connected the pump to the concrete pipe line. The concrete pipe laid by respondent consisted of three-foot lengths, joined with concrete collars. Approximately 1,270 feet of this concrete pipe were installed. Neither pipe nor collars were of reinforced concrete.

July 18, 1945, the pump was operated (by appellant's father) for the first time after its connection with the concrete pipe line. Soon after the pump had been started, at approximately half speed, the connection of the concrete pipe with the galvanized portion of the line broke. Before the pump could be turned off, a hole was washed in the soil, which was fifteen feet in depth, twelve feet long, and six feet wide, according to the testimony of Wagenman, who inspected the damage the following day. He stated that, in his opinion, the pump had shifted, and asked that it be anchored. Up to this point, there is little, if any, conflict in the testimony.

We shall now discuss the evidence introduced on behalf of respondent.

George Wagenman testified that, at the time of the install-ation of the pipe line, he was in the employ of respondent as a field man, and was in charge of the installation. At the time of the trial, he was manager of respondent's Okanogan branch. Mr. Wagenman testified that the pipe was installed, at his direction, by other employees of respondent, and that he was not present when the pump was first operated, July 18th, but visited the farm the next day and saw the hole created when the pipe broke. He testified that, at this time, the pump was not anchored, and that the break occurred at the point of connection of the metal pipe with the concrete pipe. After appellant had filled the hole created by the washout, Mr. Wagenman directed the reconnection of the line. He told appellant that the pump should be anchored, which appellant accomplished. Shortly after the repair occasioned by the first break, the line broke again at the same point, which break respondent also repaired.

The witness testified that he visited the farm several times to investigate leaks which appellant had reported; that about twelve "collars" were leaking, but that the leaks were not sufficient to require that the water be turned off. He sent a man to the farm in the fall of 1945 to make repairs, but appellant's father, who was in charge of the farm, did not wish the water turned off at that time, saying that he would notify respondent when the pump was turned off. However, no request for further repairs was made until the spring of 1946, when appellant purchased an additional twenty feet of metal pipe to install. Respondent's crew connected the pipe and repaired the line and, after July, 1946, respondent was not called upon to make further repairs.

On cross-examination, Mr. Wagenman admitted that he did not inspect the ditch before the pipe was laid, but stated that he knew that appellant would use a "road patrol" to dig the ditch and that such a machine dug a "V-shaped" ditch, whereas the pipe should be laid in a square ditch. He also testified that he did not visit the farm while the pipe was being laid. We quote from the testimony of the witness:

"Q. Who put this backfill over the concrete pipe? A. Our laying crew. Q. Did they come in and report to you that it

would not work because the backfill was not deep enough? A. Mr. Brantner said the ditch was not deep enough. Q. What did you do when he told you that? A. There was not much they could do. Mr. Knowles was anxious to get his water so they went ahead with the work. Q. Did you know at that time that it wouldn't work? A. If the backfill had been kept on it would have worked. Q. When Mr. Brantner reported to you that the ditch was not deep enough that was about a week before the pump was started? A. No, it was a little longer than that. Possibly two weeks. Q. Did you tell him to stop work until the ditch was deep enough? A. No. Q. Did you make any effort to inform the Knowles there was a possibility that the ditch wouldn't work because of that? A. In my conversation when I went over I told Clayton that it would have to have a twelve-inch cover and he said he would get the road patrol in and have it done. Q. I mean after that time, did you tell Knowles that the ditch was not deep enough? A. I imagine we did. It is customary that we did but I don't remember. Q. Do you know whether you told him? A. No."

The witness further testified that the concrete pipe line was not reinforced; that no reinforced collars were installed until repairs were later made, the original collars having cracked due to contraction and expansion of the pipe because it was too close to the surface, and that respondent's men went to the farm four or five times in 1946 to make necessary repairs to the pipe line.

Winnie Brantner testified that he was employed by respondent in 1944, and that he was the "boss and layer" during the pipe line installation at appellant's farm and supervised the connection of each three-foot piece of pipe. In regard to the depth of the ditch in which the pipe was laid, he testified:

"Q. What did you observe about the condition of the ditch in which you laid the pipe? A. Well, the ditch was rather shallow. Q. Did you advise anyone that the ditch was shallow? A. I am sure about that. I advised the boss [Wagenman] that it was. Q. Do you know at what depth the ten-inch concrete pipe was laid? A. Well, it was not very deep. I wouldn't say just what depth. Q. Were you there when the fill was made? A. Yes. Q. Do you recall the approximate depth of the concrete pipe after the fill was made? A. There was two-inch coverage. Q. Over

the top of the pipe? A. Yes. Q. Did the coverage make a mound above the ground level? A. No, it was about level. Q. There was no heaping of the dirt over the pipe? A. No."

On cross-examination, the witness stated that he was a carpenter by trade and, prior to the fall of 1944, had had no experience as a pipelayer, admitting that his experience in such work was quite limited. He testified further as follows:

"Q. You testified that you told the boss this ditch was too shallow. A. Yes. Q. Did you notice that the ditch was too shallow before you started laying the pipe? A. Yes. Q. Did you tell Mr. Knowles the ditch was too shallow? A. I don't recall that I did. Q. You do recall telling your boss? A. Yes. Q. Did your boss give you any instructions about what you should do about that ditch? What did your boss tell you to do? A. He didn't say. He sent some men over there with me to clean it out. Q. Clean out the ditch? A. Yes. Q. Did you clean out the ditch? A. We squared the ditch up, yes."

In respondent's brief, it is stated that its witnesses, Wagenman, Brantner, and Hutchins, testified "that at numerous times during the summer of 1945 and 1946, they personally examined the concrete pipe line and observed water being pumped through said line under pressure." The statement of facts does not support the foregoing statement. Wagenman testified that, on one occasion, he observed the pump operate for about two minutes, after which appellant's father turned it off. Brantner testified that, after the concrete pipe was laid, "I returned there and did some patching once," which was during the summer of 1945. He testified that, on this occasion, he worked on the repair of a dozen or more leaks, "mostly collar leaks—cracked collars, we call them." Otis Hutchins, a pipelayer for the company, testified that he did not assist in laying the pipe on the Knowles farm, but that, during the summer of 1945, he helped repair the pipe line two or three times. The witness stated that on one occasion, in October, 1945, he heard the pump running when he was repairing a leak some two hundred yards distant, and that the line was in operation "up to the flume."

Appellant testified that respondent's agent was advised that a crop had already been planted when the agreement

for the installation of the pipe line was made; that it was agreed that the work would be completed in two weeks, but that the line was not in working order for some time after that period; that Wagenman did not tell the witness how deep the trench should be dug, nor did he examine the same when it was completed; that he never told the witness that the ditch was not deep enough, and that the galvanized pipe line which had carried water by gravity flow from the canal was put out of commission when the concrete pipe was laid.

Appellant testified that, when the pump was started, at about half capacity, to send water through the concrete pipe for the first time, the line leaked badly at many joints; that his father turned off the water when the break in the line occurred that caused the washout, and that appellant complained to Wagenman, who sent men to fix the line, but that, whenever the water was turned on, leaks would appear at the joints of the concrete pipe and were sometimes so violent as to create holes of considerable size in the soil. Appellant testified that two-thirds of the alfalfa crop was lost and that the potato and oat crops were also short, due to lack of water. He further testified that he had caused the pump to be securely fastened after the first washout.

Clarence Apple, who dealt in machinery and pumps and had sold the pump in question to appellant, testified that he saw the pump in operation before and after its connection to the concrete pipe line; that it did not vibrate, and that, when he inspected it the second time, it was firmly anchored in an uncracked concrete block.

Appellant's father, Charles C. Knowles, testified that he operated the farm from and after the spring of 1944; that he and appellant discussed the matter of the pipe line with Wagenman, who guaranteed the pipe if respondent installed it; that Wagenman gave no instructions concerning the depth or shape of the ditch; that, when the pump was first used after its connection to the concrete pipe line, it was turned on slowly, and that many bad leaks immediately appeared in the line. He also testified regarding the break in the line and the resulting washout. The witness testi-

fied that, during the summer, respondent's employees several times tried to repair the line, but that it always leaked, the jets sometimes shooting thirty feet in the air, and that the line at no time was adequate to irrigate the entire tract.

Philip Loucks testified that, in February, 1947, he entered into a contract with appellant to purchase the farm, and had lived there and operated it since that time; that two thousand dollars of the purchase price was supposed to be for the pipe line (and pump), which appellant told him was not working properly, but agreed to have it repaired. The witness testified that the pipe line was not usable under pressure of water pumped from the river, but that, since his purchase of the property, sufficient water for irrigation purposes had been furnished by gravity flow from the canal, the water being carried through the concrete pipe line. It appears that the seasons referred to had not been dry, and that the water level in the canal was high enough to allow water to flow therefrom through the pipe line. We quote from the testimony of this witness:

"Q. Tell the Court whether or not that pipe is all right under gravity. A. There is three or four lengths between the standpipe and the steel pipe where there is enough leakage to irrigate half an acre. Q. You are referring to leakage out of the concrete pipe? A. Yes. Q. In other words, on gravity flow, that pipe leaks so bad that you can irrigate over half an acre on the leakage? A. Yes. Q. Is that the only place the concrete leaks? A. That is the only place it leaks that much. It leaks along the pipe line but it does not spout out."

From the evidence, it appears that respondent's employee Wagenman, who was in charge of the work, knew that appellant would use a "road patrol" to dig the ditch. Wagenman testified that respondent's employee Brantner told him that "the ditch was not deep enough," but it appears that respondent's agents, after squaring the ditch, proceeded with the laying of the pipe therein, without calling appellant's attention to the fact that the ditch was too shallow. Wagenman also testified that "if the backfill had been kept on it [the pipe line] would have worked." The placing of the backfill was accomplished by respondent's

employees as part of respondent's contract to lay the pipe. The record does not show definitely how much backfill was put in place, as one of respondent's employees (Brantner, who was in charge of the installation) testified that the pipe was covered by approximately two inches of earth, even with the general ground level, and that there was no heaping of dirt over the pipe, while Wagenman stated that "it was backfilled to about twelve inches. The dirt was heaped over the pipe." If a higher backfill (above the ground level) would have protected the pipe line and prevented leaks, it would seem that, under respondent's contract, such a covering might have been placed in position.

When the first break occurred, at the point where the metal and cement pipes joined, Wagenman informed appellant that the pump should be anchored, which appellant promptly accomplished. At this time, respondent's employee also advised that the steel pipe from the pump should be lengthened, whereupon appellant added twenty feet of metal pipe, which respondent's employees connected to the concrete pipe.

Four apparently disinterested witnesses testified that they occasionally passed or viewed appellant's farm and noted that the pipe line was leaking very extensively, one witness comparing it to a fountain, and another to a sprinkling system.

The trial court found that the respondent was a corporation and had paid its annual license fee for the year 1947 and subsequent years; that in June, 1945, the parties orally contracted that "the plaintiff was to deliver to the defendants an irrigation system"; that between July 7 and July 14, 1945, "the plaintiff did install a concrete irrigation pipe line for the defendants"; that "thereafter, during the year 1945, the plaintiff did repair minor leaks occurring in the line pursuant to the agreement between the parties hereto"; that the "reasonable and agreed price for the material and labor furnished for the installation" by respondent was $1,414.87, which the appellants had failed to pay, and

"That the plaintiff has not breached any warranty as to fitness of use and purpose for which the concrete irrigation

pipe line was intended and the defendants have failed in their proof of any damage resulting therefrom."

The court concluded that respondent was entitled to judgment as demanded in its complaint.

It does not appear, from the evidence, that the parties ever discussed the cost of the proposed pipe line. It may be assumed that they did so, but the record is silent upon that question. Respondent introduced in evidence its statement, with invoices for material and labor. Appellant denied all indebtedness to respondent and sought an affirmative judgment, by way of damages in a large amount.

The evidence discloses, beyond question, that respondent knew what appellant wanted and undertook to install a pipe line that would answer appellant's purposes. It clearly appears from Mr. Wagenman's testimony that he knew the particular result which appellant expected to accomplish by the installation of the pipe line, and that appellant relied upon the statements made to him that the pipe line respondent suggested would be adequate.

From the evidence, it appears that the pipe line never did satisfactorily or even reasonably accomplish the purpose for which appellant ordered its installation.

Rem. Rev. Stat., § 5836-15, subd. 1 [P.P.C. § 860-9] (Uniform Sales Act), reads as follows:

"Subject to the provisions of this act and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose. . . ."

In the case of *Long v. The Five-Hundred Co.,* 123 Wash. 347, 212 Pac. 559, this court said:

"The order here was not for a truck of a specific kind or manufacture, but was an order for a truck suitable for hauling saw logs and timber products. The appellant produced the particular truck and sold it to the respondents, knowing

the purpose for which it was intended to be used. The facts, therefore, bring the case within the rule of the case of *Hausken v. Hodson-Feenaughty Co.*, 109 Wash. 606, 187 Pac. 319, the rule recognized in the second of the cited cases as being the converse of the rule there held applicable. In other words, there was here a sale of a particular article for a particular purpose, and the rule of implied warranty of fitness for the purpose is applicable."

■ It is a generally recognized rule of law that an implied warranty of fitness of goods for a particular purpose, known to the vendor, arises when the purchaser, who is not informed as to the best article to accomplish his purpose, relies upon the advice of the seller. *Davenport Ladder Co. v. Edward Hines Lbr. Co.*, 43 F. (2d) 63.

The foregoing rule should be applied in the case at bar.

Appellant assigns error upon the court's finding that respondent was a corporation authorized to do business in the state of Washington during the year 1947, when this action was commenced. This assignment of error is without merit.

■ Careful examination of the record convinces us that the trial court erred in entering judgment in respondent's favor for the amount sued for. From the evidence, it appears beyond question that the concrete pipe line never met appellant's requirements for irrigating his farm with water pumped from the river.

It appears that appellant suffered damage as the result of the defective operation of the pipe line. However, we do not undertake to determine the amount of any such damage.

The judgment appealed from is reversed, and the cause remanded to the superior court, with instructions to grant a new trial. The new trial will be upon the evidence contained in the record as already made, and, on motion, the case will be reopened for the purpose of receiving any further competent and material evidence which may be offered by either party.

Upon the new trial, the court will determine, *inter alia*, the value (if any) to appellant of the concrete pipe line as

installed, and also the amount of damages (if any) suffered by appellant due to defective operation of the pipe line.

SIMPSON, C. J., SCHWELLENBACH, GRADY, and DONWORTH, JJ., concur.